## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UFCW LOCAL 1500 WELFARE FUND, on behalf of itself and all others similarly situated,<br><br>    *Plaintiff*,<br><br>v.<br><br>NOVARTIS PHARMACEUTICALS CORPORATION and PAR PHARMACEUTICAL, INC.,<br><br>    *Defendants*. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff UFCW Local 1500 Welfare Fund, on behalf of itself and all others similarly situated, files this Complaint against Defendants Novartis Pharmaceuticals Corporation and Par Pharmaceutical, Inc. Plaintiff's claims stem from Defendants' anticompetitive scheme to unreasonably restrain competition in the market for Exforge® and its AB-rated generic equivalents sold in the United States. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## I.     NATURE OF THE ACTION

1.     This action challenges Defendants' anticompetitive agreement to delay generic competition in the United States for Exforge, a drug product indicated for the treatment of hypertension comprising the active ingredients amlodipine and valsartan. Plaintiff seeks damages arising out of Novartis's unlawful agreement with Par not to compete in the market for Exforge and its AB-rated generic equivalents.

2.     Novartis's U.S. sales of Exforge exceeded $420 million annually, prior to the entry of generic competition.

3.     Generic manufacturers Par and Synthon Pharmaceuticals Inc. ("Synthon") were the first generic drug makers to file Abbreviated New Drug Applications ("ANDA") seeking FDA approval to market generic versions of Exforge. Par was the first to file an application for the 10/160, 5/160, and 10/320 mg strengths of amlodipine and valsartan, while Synthon was the first to file an application for the 5/320 mg strength.

4.     In connection with their applications, Par and Synthon were required to make certain certifications against the three Novartis patents covering Exforge. Both filed "Paragraph III" certifications against U.S. Patent No. 5,399,578 ("the '578 Patent"), which had pediatric exclusivity, stating that they would not seek final FDA approval until the patent and its related pediatric exclusivity expired on September 21, 2012. With regard to U.S. Patent Nos. 6,294,197

("the '197 Patent") and 6,395,728 (the '728 Patent), both Par and Synthon filed "Paragraph IV" certifications, stating that those two patents were invalid and/or not infringed by Par's and Synthon's proposed generics. As a result of these certifications, Par and Synthon were each eligible for 180-days of generic marketing exclusivity, with Par eligible for exclusivity for the 10/160, 5/160, and 10/320 mg strengths and Synthon eligible for exclusivity for the 5/320 mg strength.

5.      On March 19, 2010, the FDA granted tentative approval to Par's generic version of Exforge. The FDA granted tentative approval to Synthon's generic version of Exforge on April 15, 2010.[1]

6.      On December 30, 2011, Par acquired Synthon's rights for generic Exforge in the 5 mg/320 mg and 10 mg/320 mg strengths. As a result, Par held 180-day exclusivity for all strengths of generic Exforge. On March 28, 2013, the FDA granted final approval to all strengths of Par's generic Exforge.

7.      However, even though Par's Paragraph IV certifications constituted artificial acts of infringement that would have permitted Novartis to sue for patent infringement, rather than doing so, Novartis and Par reached an agreement (the "Agreement") whereby (1) Par agreed not to compete in the Exforge market until September 30, 2014, and (2) Novartis agreed not launch an authorized generic ("AG") version of Exforge from September 30, 2014 to March 30, 2015.

8.      This two-faceted Agreement had one ultimate effect: it drove the price of Exforge, and later its generic equivalent, to an artificially high, anticompetitive level by both extending Novartis's monopoly in the Exforge market and eliminating any generic competition for Par's generic product for six months.

---

[1] *FDA Tentatively Approves Synthon's Generic Exforge*, FDA NEWS (April 15, 2010), available at https://www.fdanews.com/articles/126203-fda-tentatively-approves-synthon-rsquo-s-generic-exforge.

9.      But for Defendants' unlawful Agreement and conduct, one or more generic versions of Exforge would have entered the market on expiration of the '578 Patent, and in any event, no later than March 29, 2013.

10.     Thus, absent Defendants' unlawful Agreement, Plaintiff and the members of the Class would have been able to purchase fixed combinations of amlodipine and valsartan at significantly lower prices substantially earlier than they did.

11.     To redress the economic injury Defendants caused, Plaintiff, on behalf of itself and all others similarly situated, seeks damages under state antitrust, consumer protection, and common laws, for their purchases and reimbursement of Exforge and its AB-rated generic equivalents from at least March 29, 2013 until the effects of Defendants' conduct cease (the "Class Period").

## II.      JURISDICTION AND VENUE

12.     This Court has jurisdiction over this matter under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed class exceeds $5,000,000, and at least one Class Member is a citizen of a state different from that of one of Defendants.

13.     This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).

14.     Venue is appropriate within this District under 28 U.S.C. §1391(b). Defendants resided, transacted business, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District. Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

15.     The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

### III.    THE PARTIES

16.     Plaintiff UFCW Local 1500 Welfare Fund ("**Local 1500**") is an employee welfare benefits fund with its principal place of business at 425 Merrick Avenue, Westbury, New York 11590. Local 1500 provides nearly 23,000 plan participants with health and welfare benefits and, with 15,000 members, is the largest grocery union in New York. During the Class Period, Local 1500 purchased and paid for some or all of the purchase price of Exforge and/or its AB-rated generic equivalents, thereby suffering injury to its business and property. Local 1500 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct.

17.     Defendant Novartis Pharmaceuticals Corporation ("**Novartis**") is a corporation organized and existing under the laws of the State of Delaware. Novartis's principal place of business is at One Health Plaza, East Hanover, New Jersey 07936. Novartis is a subsidiary of Novartis AG. It is also the NDA holder as well as a distributor for the prescription drug Exforge.

18.     Defendant Par Pharmaceutical, Inc. ("**Par**") is located at One Ram Ridge Road, Chestnut Ridge, New York 10977. Par principally develops, manufactures, and markets generic versions of brand name drugs. It is also the holder of the ANDA for generic Exforge and was responsible for manufacturing and distributing generic Exforge.

19.    All of Defendants' actions described in this complaint are part of, and in furtherance of, the unlawful conduct alleged in this Complaint, and were authorized, ordered, or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, or with the actual, apparent, and/or ostensible authority of Defendants.

## IV.    REGULATORY BACKGROUND

### A.    The Regulatory Structure for Approval of Drugs

20.    Generic competition allows purchasers at all levels of the pharmaceutical chain of distribution to purchase generic drugs at prices lower than those drugs' brand counterparts. Generic competition to a single brand drug can provide potentially billions of dollars in savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers or state Medicaid programs, both of which reimburse the cost of drug purchases by covered individuals.

21.    The FDA sets the standards for the approval of generic drugs. Upon satisfaction of FDA regulations governing, among other things, safety, efficacy, and labeling, the FDA confers upon a generic drug an "AB" rating. The AB rating signifies that the generic version is, for all intents and purposes, bioequivalent to its brand counterpart. As defined in the regulations, bioequivalence is:

> the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study.[2]

22.    The AB rating permits the generic drug to be substituted for the brand drug at a pharmacy counter. All States permit—and indeed, some States require—pharmacists to

---

[2] 21 C.F.R. § 320.1(e).

substitute an AB-rated generic drug for the corresponding brand drug, unless the prescribing healthcare provider has specifically stated that the brand drug is to be used.

23.     Many health insurers and other third-party payors have adopted policies to encourage the substitution of AB-rated generic drugs for their brand name counterparts. For example, many third-party payors implement a tiering system that places certain drugs on different benefit tiers. A drug that is placed on one tier may receive only partial reimbursement, while a drug placed on another tier may receive full reimbursement. Typically, branded drugs are placed on a different tier than their corresponding generic. Furthermore, branded drugs with a generic equivalent are usually subject to smaller reimbursements or higher co-pays, while generic drugs will be given total (or near total) reimbursement with a limited, or no, co-pay.

24.     As a result of these policies, healthcare professionals are incentivized to prescribe generics so that they can receive higher reimbursements. In addition, these policies also incentivize end users to request generic drugs because of the cost savings they may receive with respect to their co-pay.

25.     Because both healthcare professionals and end users are economically incentivized to prefer generic drugs, AB-rated generics are usually able to capture a substantial portion of the market.

26.     The first AB-rated generic is typically priced at a discount to its brand counterpart. And as additional AB-rated generics obtain FDA approval to enter the market, the resulting increase in competition causes prices of the first generic to drop dramatically. Indeed,

an FTC study found that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices"—*i.e.*, 15% of the pre-entry branded drug's price.[3]

27.     Empirical studies show that within a year of generic entry, generics will have obtained about 90% of the market, *i.e.*, pharmacists fill 90 of every 100 prescriptions for the compound with an AB-rated generic.

**B.     FDA New Drug Approval Process**

28.     The Federal Food, Drug and Cosmetic Act (the "FDCA") and its accompanying regulations set the standards for the approval of any new drug compound that is to be marketed, sold, or distributed in the United States. Drug manufacturers seeking to gain FDA approval for a new drug must file a New Drug Application ("NDA"). Applicants filing an NDA are required to provide a host of information demonstrating the safety and efficacy of their drug, including, but not limited to: (1) information and studies regarding the chemistry of the drug substance, which includes information concerning how the drug is manufactured; (2) information and studies regarding nonclinical pharmacology and toxicology for the new drug; (3) information and studies regarding the human pharmacokinetics and bioavailability; and (4) information and data from clinical studies on human subjects.[4]

29.     Upon satisfying FDA regulations concerning efficacy, safety, and labeling, the FDA will approve the NDA, permitting the applicant to market, sell, and distribute the approved drug to the U.S. public.

30.     In addition, upon receiving FDA approval, the brand manufacturer will list any patents it believes cover the approved drug in a publication called the "Approved Drug Products

---

[3] FTC Staff Study, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions, at 8 (Jan. 2010), available at http://emmanuelcombe.org/delay.pdf.

[4] *See* 21 C.F.R. § 314.50(c)-(d).

with Therapeutic Equivalence Evaluations," which is more commonly referred to as the "Orange Book."[5]

31.     However, only drug substance patents (active ingredient), drug product patents (formulation and composition), and method-of-use patents qualify for listing in the Orange Book.[6] Thus, for example, process patents covering a new drug are not eligible for listing (although they may be asserted in a future patent litigation against any allegedly infringing product).

32.     In listing patents in the Orange Book, the FDA acts in a ministerial capacity. It does not verify whether the patents listed in the Orange Book are properly listed and instead relies on the accuracy and truthfulness of the NDA applicant.

33.     In addition to the protection conferred by patents covering the brand manufacturer's drug, NDA applicants are afforded additional statutory protections for a drug containing a new active ingredient. NDAs for drugs containing a new active ingredient are given up to five years of marketing exclusivity before any generic drug manufacturer may file an application for the approval of a generic formulation.[7]

### C.    The Hatch-Waxman Act Encourages and Facilitates the Approval of Generic Drugs

34.     In 1984, Congress amended the FDCA with the enactment of the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984), more commonly known as the "Hatch-Waxman Act."

35.     The Hatch-Waxman Act simplifies the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Instead of filing a

---

[5] 21 U.S.C. § 355(j)(7)(A)(iii).

[6] 21 C.F.R. § 314.53(b).

[7] 21 U.S.C. § 355(j)(5)(F)(ii).

lengthy and highly costly NDA, the Hatch-Waxman Act allows generic drug manufacturers to obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA").

36.     If an ANDA applicant shows that the generic drug is bioequivalent to the brand drug, then the ANDA applicant may rely on scientific and other data compiled in the brand drug NDA it references concerning, among other things, safety and efficacy.[8] The ability to rely on the scientific data published in the referenced NDA obviates the need for duplicative and expensive experimentation and clinical trials, which in some instances can result in out-of-pocket costs of upwards of $130 million.[9] The FDA must approve an ANDA unless the information submitted in the ANDA is insufficient to meet the requirements under the Hatch-Waxman Act.[10] In sum, the streamlined approval process under the Hatch-Waxman Act makes it easier for generic drug manufacturers to bring competing and cheaper generic products to market.

37.     Although the Hatch-Waxman Act seeks to facilitate generic competition, the brand manufacturer retains the right to enforce any patents associated with its brand drug. As part of its ANDA, the applicant must certify that the generic drug will not infringe any of the Orange Book patents because: (1) no patents exist on the brand drug ("Paragraph I certification"); (2) the patents have expired ("Paragraph II certification"); (3) the patents will expire by the time the generic product comes to market ("Paragraph III certification"); or (4) the patents are invalid, unenforceable, or will not be infringed by the sale of the generic product ("Paragraph IV certification").[11]

---

[8] 21 U.S.C. § 355(j)(2)(A).

[9] *See* C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 N.Y.U. L. Rev. 1553, 1564 n.36 (2006).

[10] 21 U.S.C. § 355(j)(4).

[11] 21 U.S.C. § 335(j)(2)(A)(vii)(I)-(IV).

38.     When a generic drug manufacturer files a Paragraph IV certification asserting that one or more patents listed in the Orange Book are invalid, unenforceable, or will not be infringed, it must serve notice of its certification to both the brand manufacturer and the owner(s) of the patent. The issuance of a Paragraph IV certification creates an "artificial act" of patent infringement, permitting the patent owner to file a patent infringement suit against the ANDA applicant making the Paragraph IV certification(s).[12]

39.     If the brand manufacturer files a patent infringement suit against the ANDA applicant within 45 days of receiving the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of: (a) 30 months, running from the date the when the Paragraph IV notice was served on the patentee; or (b) a court ruling that the patent is invalid, unenforceable, or not infringed by the ANDA.[13] During the 30-month stay, the FDA may grant "tentative approval" of an ANDA if the FDA determines that the ANDA would otherwise qualify for final approval but for the 30-month stay.

40.     Despite the threat of a patent infringement suit and a 30-month stay, the Hatch-Waxman Act creates powerful incentives for generic drug manufacturers to file ANDAs. Specifically, the Hatch-Waxman Act grants a 180-day period of market exclusivity to the first applicant (the "first filer") to file a substantially complete ANDA containing a Paragraph IV certification.

41.     During the 180-day period of market exclusivity, the first filer only competes against the brand manufacturer and, possibly, any AG marketed under the brand manufacturer's NDA; all other generic ANDA applicants must wait until either the expiration of the 180-day

---

[12] 35 U.S.C. § 271(e)(2)(A).

[13] 21 U.S.C. § 355(j)(5)(B)(iii).

exclusivity period or a court order finding that each of the patents that are the subject of a Paragraph IV certification are invalid, unenforceable, or not infringed.

42.     Because all other ANDA generics are barred from the market during the first filer's 180-day exclusivity period, the first-filing ANDA applicant is able to price its generic version at a price that is around 20%-30% below the brand drug's price. This allows the first filer to gain market share, while simultaneously taking advantage of the price umbrella created by the brand manufacturer's pricing. Indeed, during the first-filer's 180-day exclusivity period, the first-filer can capture over 80% of branded and generic unit and dollar sales.

43.     However, once the first filer's 180-day exclusivity period expires, all other FDA-approved ANDA filers can begin to market their generic equivalents, driving down prices substantially and reducing the profitability of both the branded drug and the first filer's generic.

**D.    Brand Manufacturers and First Filers Manipulate the Regulatory Structure to Delay the Emergence of Generic Competition**

44.     Because the Hatch-Waxman Act automatically stays the approval of an ANDA when a brand manufacturer files an infringement suit against an ANDA applicant, brand manufacturers have an incentive to liberally (and sometimes wrongfully) list in the Orange Book all patents potentially covering the brand drug. Upon a generic drug manufacturer's filing of an ANDA with a Paragraph IV certification, the brand manufacturer will then sue on one or more of those Orange Book patents to trigger the stay.

45.     Frequently, patent infringement suits arising from Paragraph IV certifications result in settlements. In some of these settlements, the brand manufacturer will offer the generic drug manufacturer some form of consideration (*i.e.*, payment) in exchange for the generic drug manufacturer agreeing to delay entry of its generic product. These settlements commonly are referred to as "pay-for-delay agreements."

46.     These pay-for-delay agreements have the practical effect of permitting the settling brand manufacturer to retain a significant portion of its monopoly profits while only ceding a relatively small portion of those profits to the settling generic drug manufacturer in exchange for the generic drug manufacturer's agreement to delay market entry.

47.     The incentive to create these types of agreements is particularly acute between a brand manufacturer and the first-filing ANDA applicant. In these agreements, the brand manufacturer seeks to delay generic entry and preserve its monopoly for as long as possible. Typically, a generic drug manufacturer will want as early an entry date as possible, if only for the higher present value of earlier sales.

48.     However, unlike other generic drug manufacturers, a first-filing ANDA applicant has the potential benefit of 180 days of marketing exclusivity where it can reap substantial revenues from sales of potentially one of two products in the relevant drug market. A first-filing ANDA applicant's continued litigation against the brand manufacturer runs the risk that the court will find the patent(s) at issue valid, enforceable, and/or infringed by the first filer's ANDA. A finding of validity, enforceability, and/or infringement by a court would negate the first filer's Paragraph IV certification and disqualify that generic drug manufacturer from receiving the benefit of 180 days of marketing exclusivity. Thus, the first filer has an acute interest in settling the patent infringement lawsuit as a means of guaranteeing its 180-day exclusivity period, and, in turn, the economic bounty associated with it.

49.     With the promise of substantial revenue during its generic exclusivity period secure, the first filer cares little about date of ultimate launch sought by the brand manufacturer—that is so long as the brand name manufacturer sufficiently compensates the first filer for the delay in launching its generic.

50.     Moreover, brand manufacturers are willing to pay substantial sums to the first filer for any delay in generic launch in exchange for the promise that the first filer will not enter before a certain date. This is because the value of monopoly profits is so great.

51.     In essence, by settling with the brand manufacturer, the first filer receives a double bonus in the form of: (1) a substantial payment from the brand manufacturer to forgo early entry and (2) the guarantee of substantial revenues as the only generic on the market (absent an authorized generic) during that first filer's 180-day exclusivity period. Under such circumstances, the first-filing ANDA applicant has limited incentive to continue the patent litigation for purposes of securing a judgment of non-infringement, invalidity, or unenforceability—and thus, a potentially earlier entry date—because it still retains the economic bounty associated with its statutory 180-day exclusivity period.

52.     Such pay-for-delay agreements also create powerful disincentives for subsequent ANDA filers to continue defending their ANDAs in patent infringement litigations against the brand manufacturer. Specifically, once it becomes apparent that the brand manufacturer and the first filer have settled their patent litigation, subsequent ANDA filers usually will not pursue litigation aggressively, and, often, settle as well.

53.     Subsequent ANDA filers are unlikely to continue litigating because obtaining a judgment that the patents subject to Paragraph IV certifications are invalid, unenforceable, or not infringed provides little pay-off to them. Although the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "MMA"), Pub. L. No. 108-173, 117 Stat. 2066 "MMA") attempted to make the incentives underlying pay-for-delay agreements less attractive by enumerating a series of forfeiture events that, if triggered, will deprive a first filer of

14

its 180-day exclusivity period, it has failed to alleviate the problems caused by pay-for-delay agreements.

54.    One of the key forfeiture events under the MMA is if the first filer fails to obtain tentative approval within 30 months of submitting its ANDA.[14] While noble in purpose, scholars have found the MMA's "use it or lose it" provision to be woefully inadequate in deterring anticompetitive agreements to delay generic competition for two reasons. First, market acceleration clauses, which are standard components of pay-for-delay agreements, allow the first filer to accelerate its entry into the market ahead of the later date agreed to with the brand manufacturer in its settlement should a subsequent generic challenger prevail in the courts.

55.    Second, brand manufacturers can avoid triggering a potential forfeiture event by only suing on some, but not all, of the patents subject to the first filer's Paragraph IV certifications. Because a subsequent filer needs to obtain a judgment of invalidity or non-infringement with respect to *all* patents that are the subject of a first filer's Paragraph IV certification in order to trigger the forfeiture event, the brand manufacturer need only sue on a few of the patents to avoid that scenario.

56.    The lengthy and expensive nature of patent litigation makes it such that subsequent filing generic drug manufacturers typically do not have the stomach to pursue litigation to the end. Indeed, by the time a generic drug manufacturer secures the judgments necessary, "the clock [will] simply run[] out on the subsequent generic filers fighting to open the market earlier than the date agreed to by the first filer in its 'parked' exclusivity settlement."[15]

---

[14] 21 U.S.C. § 505(j)(5)(D)(i)(I).

[15] Letter from Michael Carrier, Rutgers School of Law, to Sen. Tom Harkin, at 3 (Apr. 21, 2011), *available at* http://www.hpm.com/pdf/blog/LIPITOR%20-%20Balto-Carrier%20Ltr.pdf.

E.    **No-Authorized Generic Agreements Delay Generic Competition**

57.    Pay-for-delay agreements can be augmented by including terms in which the brand manufacturer agrees not to launch an authorized generic to compete with the first filer during its 180-day exclusivity period.

58.    As a threshold matter, a first filer's 180-day exclusivity period does not prevent a brand manufacturer from marketing its own authorized generic during that period of generic exclusivity. Authorized generics are chemically identical to the branded drug and are marketed under the brand manufacturer's NDA. An authorized generic can be marketed either through a generic drug division of the brand manufacturer or through a third-party generic drug manufacturer.

59.    Competition from an authorized generic during the first filer's 180-day exclusivity period substantially reduces the first filer's profit margins and increases price competition that ultimately benefits consumers and other purchasers of the branded drug and the first filer's generic equivalent.

60.    In a 2011 study titled, *Authorized Generic Drugs: Short-term Effects and Long-Term Impact* (the "FTC 2011 Report"), the FTC found that authorized generics capture a significant number of generic drug sales, reducing the first filer's revenues by between 40 percent and 52 percent on average during the 180-day exclusivity period.

61.    Although first filers make significantly less money when they are forced to compete with an authorized generic during the first 180 days, consumers benefit from the lower prices caused by competition between the authorized generic and the first filer.

62.    In light of the substantial negative effects on a first filer's bottom-line that can be caused by the presence of an authorized generic, a promise by a brand manufacturer to not launch, or license, an authorized generic confers significant monetary value to a first filer. The

value conferred to a first filer is tantamount to a payment for agreeing to delay generic entry and competition.

## V.    FACTUAL ALLEGATIONS

### A.    Novartis Launches Exforge

63.    High blood pressure affects an estimated one in four adults. On June 20, 2007, the FDA approved Novartis's NDA for Exforge tablets. Shortly thereafter, Exforge tablets were launched into the U.S. marketplace. At that time, Exforge was the first high blood pressure medication to combine the most commonly prescribed branded high blood pressure medicines in their respective classes—the calcium channel blocker ("CCB") amlodipine besylate (marketed under the brand name Norvasc) and the angiotensin-II receptor blocker ("ARB") valsartan (marketed under the brand name Diovan).

64.    Novartis claimed that Exforge, the combination of valsartan and amlodipine, offered patients the convenience of a reduced pill load for their hypertension medication, increasing patient adherence.

### B.    Par and Synthons File ANDAs for Generic Exforge

65.    Par filed ANDA 90-011 on October 1, 2007 for the 10/160, 5/160, and 10/320 mg strengths of Exforge. It was the first applicant to file a substantially complete application containing a Paragraph IV certification for those three strengths, making Par eligible for 180 days of regulatory exclusivity.

66.    Synthon filed ANDA 90-144 on November 26, 2007 for the 5/320 mg strength of Exforge and was the first applicant to file a substantially complete application containing a Paragraph IV certification for the 5/320 mg strength, making Synthon eligible for 180 days of regulatory exclusivity for that strength.

C.    **Novartis's Exforge Patents Were Unable to Block Generic Competition Beyond September 21, 2012**

67.    Novartis listed three patents in the Orange Book for Exforge: the '578, '197, and '728 Patents. The '578 Patent, which disclosed and claimed the chemical compound valsartan, expired on March 21, 2012. However, Novartis obtained "pediatric exclusivity" for the '578 Patent—a regulatory exclusivity that permitted Novartis to sell Exforge without generic competition for an additional six months. That exclusivity expired on September 21, 2012.

68.    The '197 and '728 Patents did not expire until June 2017 and July 2019, respectively, but both were invalid and not infringed by Par's or Synthon's ANDAs, as described further below. Thus, even if Novartis had sued Par and Synthon for patent infringement, as would have been the ordinary course of events absent the unlawful Agreement, and they had actually litigated their patent infringement suits to conclusion, both patents would have been invalidated. Neither, therefore, would have offered Novartis any protection from generic competition beyond September 21, 2012. That is, once the '578 Patent expired, and its pediatric exclusivity period had run, generics could have entered the market.

1.    **The '728 Patent was no barrier to Par or Synthon's generic launch.**

69.    The '728 Patent was not infringed because its claims covered only the use of a combination of valsartan and amlodipine for the treatment of hypertension in a limited subset of patients. Moreover, had the '728 Patent's claims been challenged by Par or Synthon in litigation, they would have been declared invalid in light of prior art.

70.    *The '728 Patent was limited to use in diabetic patients.* The '728 Patent issued from U.S. Application No. 09/757,413 ("the '413 Application"), which is a divisional of U.S. Application No. 09/349,654 ("the '654 Application"). The original claims of the '654 Application broadly recited (1) "[a] method for the treatment or prevention of [a wide variety of

different disease states] comprising administering a therapeutically effective amount of a combination" of valsartan, a calcium channel blocker and a pharmaceutically acceptable carrier; and (2) "[a] pharmaceutical combination composition comprising" those same ingredients.[16] As originally filed, those claims were not limited to the use of valsartan and amlodipine in the treatment of patients suffering from diabetes.[17]

71.    However, the examiner at the PTO rejected each of those claims in the '654 Application as obvious in view of U.S. Patent No. 5,492,904 ("the '904 Prior Art Patent") and the prescribing information for Diovan® ("the Prior Art Diovan Literature").[18] The examiner noted that the '904 Prior Art Patent taught the combined use of an angiotensin-II antagonist (like valsartan) and a calcium channel blocker (like amlodipine):

> [The '904 Prior Art Patent] teach[es] pharmaceutical compositions which comprise an angiotensin-II antagonist and a calcium channel blocker of the type presently claimed which are useful in the treatment of hypertension and congestive heart failure. See the abstract and column l, lines 25-40. It is further taught that the compositions may comprise from 10 to 300 mg of the desired calcium channel blocker and from 1 to 100 mg of the angiotensin-II antagonist.[19]

72.    The examiner acknowledged that the '904 Prior Art Patent did not teach valsartan but also noted that the Prior Art Diovan Literature "discloses that valsartan was a well-known angiotensin-II antagonist."[20] Accordingly, the examiner deemed the originally-claimed subject matter to be obvious.[21]

---

[16] '654 Application at 11.

[17] *Id.*

[18] Office Action dated May 25, 2000.

[19] *Id.* at 2.

[20] *Id.*

[21] *Id.* at 3.

73.    The applicants for the '654 Application amended their claims, but the examiner reiterated his rejection.[22] In response to the rejection, the applicants amended method of use claim 1 by deleting the broad recitation of disease conditions and narrowing it to the treatment of "hypertension *associated with diabetes*."[23] Thereafter, the '654 Application issued as U.S. Patent No. 6,204,281.

74.    The '413 Application was filed as a divisional application on January 9, 2001, along with a preliminary amendment, which contained claims that were similar to those that had been originally filed in the '654 Application. The examiner rejected the claims pending in the '413 Application as obvious for the same reason he had rejected the claims in the '654 Application.[24]

75.    In response to the rejection, the applicants limited claim 1 to the treatment of "hypertension associated with diabetes."[25] In explaining why the amendment would overcome the examiner's obviousness objection—which applied to *all* pending claims, including the method of use claims—the applicants argued that they had shown unexpected results in the treatment of diabetes:

> Applicants have clearly shown unexpected results in the treatment of diabetes associated with hypertension with the combination of valsartan and verapamil. For example, on page 6 to page 7 of the instant application (inserted by this amendment), Applicants have shown that treatment with the combination of valsartan and verapamil resulted in a considerable reduction of sudden death events and significant degree of increase of the survival rate as compared to the administration of the single drugs alone. These unexpected results are sufficient to overcome the obviousness rejection based on the references because a combination of the

---

[22] Office Action dated August 29, 2000 at 3-4.

[23] Amendment After Final Rejection dated October 20, 2000 at 1-2.

[24] April 27, 2001 Office Action at 3.

[25] Amendment dated July 25, 2001 at 3.

references do not teach or suggest the treatment of hypertension associated with diabetes.[26]

76.     Thus, while the composition of matter claims did not refer explicitly to diabetes, the applicants' argument was premised on the view that those claims were also limited to the use of the claimed pharmaceutical composition in patients suffering from diabetes.[27]

77.     The examiner again rejected the claims.[28] In response, the applicants further amended the claims to limit them to the use of valsartan with amlodipine. In doing so, they again made clear that both the method of use and composition of matter claims should be viewed as limited to the use in the "treatment of hypertension associated with diabetes":

> Claims 1, 4 and 9 have been amended to recite amlodipine as the selected calcium channel blocker. The treatment of hypertension associated with diabetes by administering a combination of valsartan and amlodipine is neither taught nor suggest by the cited references. Accordingly, the rejection has been overcome and should be withdrawn.[29]

78.     Thus, it is clear that the '728 Patent was limited to the treatment of hypertension associated with diabetes. That, though, was not what Par was seeking FDA approval to market its product for. As a result, Par's ANDA application could not have infringed a claim that was limited to this use.

79.     ***Had they been challenged, the claims of the '728 Patent would have been declared invalid in light of prior art.*** U.S. Patent No. 5,492,904 ("the '904 Prior Art Patent") issued on February 20, 1996, more than three years before the earliest possible effective filing date of the '728 Patent. It is therefore prior art to the '728 Patent.

---

[26] *Id.* at 4.

[27] *Id.* ("Claims 1-9 have been rejected . . . . Applicants respectfully traverse this rejection. The claims are now directed to hypertension associated with diabetes.").

[28] Office Action dated August 1, 2001.

[29] Amendment after Final Rejection, dated September 24, 2001.

80.     The '904 Prior Art Patent is titled "Composition of Angiotensin-II Receptor Antagonists and Calcium Channel Blockers" and teaches the use of a pharmaceutical composition comprising an angiotensin-II receptor antagonist and a calcium channel blocker for the treatment of hypertension.[30] The '904 Patent also teaches that "the combinations of active compounds can be administered alone, but are generally administered with a pharmaceutical carrier selected on the basis of the chosen route of administration and standard pharmaceutical practice."[31] It also teaches that "[t]he combinations of this invention can be administered for the treatment of hypertension" and that the "[p]harmaceutical compositions of the invention may contain from 10 to 300 mg of the desired calcium channel blocker and 1 to 100 mg of the angiotensin-II receptor antagonist per unit dose one or more times daily."[32] The '904 Prior Art Patent also references certain disease states involving "diabetic" conditions.[33]

81.     That the '904 Prior Art Patent does not explicitly reference valsartan is unsurprising. The patent application that issued as the '904 Prior Art Patent was filed on July 28, 1994, whereas the prior art '578 Patent disclosing valsartan did not issue until March 21, 1995. Thus, the '904 Prior Art Patent was filed before valsartan was publicly disclosed by the '578 Patent. However, as soon as the '578 Patent was issued and disclosed valsartan, it would have been obvious to use valsartan as the angiotensin-II receptor antagonist in the combination treatment taught by the '904 Prior Art Patent.

## 2.     The '197 Patent was no barrier to Par or Synthon's generic launch.

82.     The relevant claims of the '197 Patent, had they been challenged by Par or Synthon, would likely have been declared invalid. The earliest effective filing date for the '197

---

[30] '904 Prior Art Patent at 1:15-40.

[31] Id. at 4:37-40.

[32] Id. at 4:4-5 and 44-48.

[33] Id. at 3:56-4:3.

Patent is June 18, 1997. Therefore, the '578 Patent, which issued on March 21, 1995, is prior art to the '197 Patent. Claim 1 of the '197 Patent, for example, recites the following:

> A compressed solid dosage form comprising a) an active agent containing an effective amount of Valsartan or a pharmaceutically acceptable salt thereof; and, b) at least one pharmaceutically acceptable additive wherein the active agent is present in an amount of more than 35% by weight based on the total weight of the compressed solid dosage form.[34]

83.     The '578 Patent anticipates this claim, thereby rendering it invalid.[35] More specifically, the prior art '578 Patent teaches a tablet (*i.e.*, a compressed solid dosage form) comprising 35.7% valsartan and a number of pharmaceutically acceptable additives including, for example, lactose.[36]

84.     The Patent Office examiner apparently did not understand that example 93 of the '578 Patent related to valsartan. Valsartan is a generic name for the chemical compound (S)-N-(1-carboxy-2-methylprop-1-yl)-N-pentanoyl-N-[2'-(1H-tetrazol-5-yl)- biphenyl-4-ylmethyl-] amine. The '578 Patent does not use the term "valsartan" but rather referred to the compound by its chemical name. Had the examiner understood that example 93 of the '578 Patent referred to valsartan, he would have rejected claim 1 as having been prior art disclosed by the '578 Patent.

85.     Rather than disclose to the examiner that example 93 of the '578 Patent related to valsartan, the applicants exploited the examiner's lack of appreciation. For example, after the examiner rejected the pending claims based in part on the Muller prior art reference, the applicants argued:

> In this case, the combination of references cited by the Examiner provides no teaching, suggestion or motivation to produce the solid dosage forms of valsartan as claimed by Applicant. Muller teaches

---

[34] '197 Patent at 10:22-30.
[35] '578 Patent at 63:25-52 (example 93).
[36] *Id.*

a valsartan capsule and does not teach whether the capsule is a
compressed dosage form. Muller also fails to disclose any detail
about the formulation of the valsartan capsule. Indeed, Muller
lacks any disclosure regarding the relative weight of valsartan in
the capsule.[37]

86.    Notably, the teaching that the applicants argued was absent from the prior art

references cited by the examiner was precisely the teaching supplied by the prior art '578 Patent.

The applicants also argued that "[t]he unique chemical properties of angiotensin type II receptor

antagonists have made it difficult in some cases to develop formulations useful for the creation

of tablets."[38] But again, this argument could not have been made had the examiner known that

the prior art '578 Patent taught a tablet form of valsartan.

87.    As another example, claim 5 of the '197 Patent depends on claim 1 and recites

that the valsartan dosage range is from "40 to 160 mg."[39] Example 93 of the '578 Patent taught a

100 mg valsartan dosage, and therefore the '578 Patent also anticipates claim 5.

**D.    Novartis Failed to Bring Suit Against Par and Synthon**

88.    Par and Synthon, the first generic firms to file ANDAs with the FDA, filed

Paragraph III certifications to the '578 Patent and Paragraph IV certifications to the '197 and

'728 Patents. As a result, absent suit from Novartis, Par and Synthon's ANDAs would each be

eligible for FDA approval as early as September 21, 2012.

89.    Soon after filing their ANDAs, Par and Synthon sent Paragraph IV notices to

Novartis that included "a detailed factual and legal statement as to why" the '197 and '728

Patents were "invalid, unenforceable, and/or not infringed" by Par's and Synthon's ANDA

products.

---

[37] Amendment dated July 31, 2010, at 10.
[38] March 12, 2001 Amendment at 4.
[39] '197 Patent at 10:42-43.

90.     However, Novartis did not file a lawsuit against Par or Synthon for infringement of the '197 and '728 Patents within the 45-day time period set forth in the statute to trigger a 30-month stay of ANDA approval. Accordingly, no 30-month stay barred the FDA's approval of Par's and Synthon's ANDAs.

91.     The fact that Novartis never sued Par on the '197 or '728 Patents reflects Novartis's belief that those patents did not afford Novartis any right to exclude Par from marketing its generic version of Exforge. Evidence of the weakness of the '197 and '728 Patents includes: (1) Novartis's decision not to sue for patent infringement and enforce its intellectual property in court, and (2) the facts set forth above and in Par's Paragraph IV certification notice letters.

92.     Free from the burden of litigating a patent infringement suit, Par and Synthon marched through the ANDA approval process. On March 19, 2010, the FDA granted tentative approval to Par's ANDA for the generic version of Exforge, indicating that Par's ANDA was otherwise approvable, and satisfied all bioequivalence, manufacturing, and labeling requirements. Therefore, as of March 19, 2010, Par was eligible for FDA final approval, subject only to the expiration of the '578 Patent and its related exclusivity.

93.     Similarly, on April 15, 2010, the FDA granted tentative approval to Synthon's ANDA for generic version of Exforge, indicating that Synthon's ANDA was otherwise approvable, and satisfied all bioequivalence, manufacturing, and labeling requirements. Therefore, as of April 15, 2010, Synthon was eligible for FDA final approval.

**E.     Novartis and Par Entered an Unlawful Agreement to Delay Generic Competition**

94.     Novartis did not sue either Par or Synthon when it received notice of their respective Paragraph IV certifications.

95.     In December 2011, Par acquired Synthon's rights to Exforge, and, as a result, was eligible to receive 180-days of generic marketing exclusivity for all strengths of generic Exforge.

96.     And because Par had tentative approval, it was well-positioned to receive final approval of its generic Exforge ANDA. Realizing that little stood in the way of Par entering the market and competing against branded Exforge, on or around the time Par acquired the rights to Synthon's Exforge ANDA, Novartis reached an agreement with Par, in which Par agreed to abandon its efforts to launch after the expiration of the '578 Patent. Par agreed to delay its launch of generic Exforge until September 30, 2014, roughly two years after expiry of the '578 Patent. In exchange for this agreed-upon delay, Novartis agreed not to launch an AG for the first six months after Par's entry.

97.     By entering this unlawful agreement, Novartis secured its monopoly over Exforge for an additional two years. And with Novartis's agreement not to launch an Exforge AG during Par's 180-day exclusivity period, Par secured for itself 100% of the generic Exforge market upon its launch.

98.     But for the Agreement, Par would have been ready, willing, and able to launch generic Exforge after the expiration of the '578 Patent but, in all events, no later than March 29, 2013. And, upon Par's launch of generic Exforge, Novartis would have launched an AG of Exforge in competition with Par's product.

F.     **Par's Agreement to Delay Was Worth Tens of Millions to Novartis, and Novartis's No-AG Promise Was Worth Tens of Millions to Par**

99.     By 2009, Exforge was already generating hundreds of millions of dollars per year in revenues for Novartis. Had Par launched soon after the expiration of the '578 Patent, Novartis would have lost a substantial portion of that revenue stream. Thus, Novartis had enormous

incentives to avoid patent infringement litigation that it knew it could not win. The Agreement enabled Novartis to sidestep the litigation and continue sales of Exforge at monopoly prices.

100.    The Agreement similarly benefitted Par by guaranteeing that it would be the sole generic on the market during its 180-day exclusivity period. Under the Agreement, Par captured all or substantially all of the sales that would have gone to the Exforge AG and charged significantly higher prices for its generic product without price competition from the AG. Par also benefited by delaying its launch of generic Exforge from September 21, 2012 to September 30, 2014 because Novartis could continue raising prices during that time, making the market more lucrative once Par entered.

101.    By launching an AG of Exforge, Novartis could have taken significant sales away from Par and pushed down prices for generic Exforge. As the FTC noted: "[C]onsumers benefit and the healthcare system saves money during the 180-day exclusivity period when an AG enters the market, due to the greater discounting that accompanies the added competition provided by the AG."[40]

102.    Novartis itself stated in public SEC filings that "[t]he company that launches an authorized generic typically launches its product at the same time as the generic exclusivity holder."[41]

103.    Novartis's promise not to launch an AG during Par's exclusivity period was extremely valuable to Par and went beyond what Par could have achieved if it was sued and won

---

[40] FTC, *Authorized Generics: An Interim Report* (June 2009), at 16, https://www.ftc.gov/sites/default/files/documents/reports/authorized-generics-interim-report-federal-trade-commission/p062105authorizedgenericsreport.pdf.
[41] Novartis AG, Form 20-F, at 89 (Jan. 27, 2015), https://www.sec.gov/Archives/edgar/data/1114448/000104746915000433/a2222787z20-f.htm.

27

patent litigation pertaining to the '197 and '728 Patents. As Novartis stated in its regulatory filings:

> [A]uthorized generics also reduce the value of the exclusivity for the company that invested in creating the first generic medicine to compete with the originator product. Furthermore, certain research-based companies continually seek new ways to protect their products and to decrease the impact of generic competition, thus potentially limiting the profit that the generic companies can earn on the competing generic product.[42]

104.    Novartis sacrificed significant profits by agreeing not to launch an Exforge AG. Absent the unlawful Agreement, it would make economic sense for Novartis to launch an Exforge AG during Par's 180-day marketing exclusivity so that Novartis could retain some of the sales that Par's less expensive generic otherwise would capture.

105.    As alleged above, an AG typically captures approximately 50% of the generic sales during first 180 days of generic marketing. By 2014, Novartis's annual Exforge sales were approximately $422 million. Using these sales figures, Defendants could assume that six months of sales would generate revenue of at least $211 million.

106.    As is common in the pharmaceutical industry, the first generic is expected to take 80% (or more) of the brand sales. Thus, approximately $169 million worth of brand sales would be converted to the generic.

107.    As is also common with only one generic on the market, the generic is typically priced at 90% of the brand, which would result in generic sales of approximately $152 million. Thus, the sales revenue during the 180-day exclusivity period that would reasonably have been anticipated by Par under the no-AG deal would be approximately $152 million.

---

[42] *Id.*

108.    Par's expectations would have differed dramatically if Novartis had not promised to refrain from competing with its own AG. According to the FTC, the addition of an AG causes the average generic price drop to 52% of the brand price. Thus, with an AG on the market, Exforge generic sales would drop to approximately $88 million.

109.    Further, it is reasonable to expect that generic Exforge sales would be split evenly between Par and the Novartis AG. Thus, with an Exforge AG, Par's share of the revenue from sales of generic Exforge during the first six months would be expected to be approximately $44 million.

110.    As a result, the expected value at the time of the agreement to Par of having no-AG versus facing competition from an AG would have been at least approximately $108 million. Thus, through the no-AG promise, Novartis effectively handed Par a $108 million cash payment.

111.    Novartis, which owns the generic company Sandoz, Inc., has a history of launching authorized generic versions of its own branded products in the face of actual or impending competition from ANDA-based generics. The FTC has found that, in the time period from 2001 to 2008, only three companies launched more AGs than Novartis:



112.    More recent FDA records show that Novartis has launched at least 16 AGs between 2005 and 2016, including AGs of Exelon, Famvir, Focalin XR, Lescol XL, Lopressor HCT, Lotrel, Patanase, Patanol, Ritalin, Ritalin SR, Sandostatin, Tegretol XR, Tobi, Tobradex, Trileptal, and VivelleDot.[43]

113.    Launching an Exforge AG contemporaneously with Par's generic launch would have been economically rational because "the vast majority of potential profits for a generic drug manufacturer materialize during the 180-day exclusivity period."[44] Accordingly, in the absence

---

[43]    *See* FDA's Listing of Authorized Generics as of March 28, 2018, *available at*: http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDER/UCM183605.

[44]    *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2229 (2013).

of the anticompetitive Agreement, Novartis would have launched an Exforge AG upon Par's launch of generic Exforge.

114.    Indeed, immediately following the expiration of Par's 180-day exclusivity, Novartis launched an Exforge AG through its sister company Sandoz, Inc. Novartis's conspicuous failure to launch an Exforge AG until *after* Par's 180-day exclusivity expired—combined with its extensive history of launching AGs in the face of generic competition—strongly suggests that the failure was the result of a pre-existing agreement with Par not to launch an Exforge AG.

115.    Thus, but for the Agreement, Par would have launched generic Exforge soon after the expiration of the '578 Patent, but in no event later than March 29, 2013. And upon Par's launch, Novartis would have launched an AG of Exforge. Then, following the expiration of Par's 180-day exclusivity, other generics would have launched immediately thereafter.

116.    Several generic companies were poised to launch generic Exforge upon expiration of Par's 180-day exclusivity. Indeed, Mylan, N.V., ("Mylan"), Teva Pharmaceutical Industries, Ltd. ("Teva"), Torrent Pharms, Ltd. ("Torrent"), Novel Labs, Inc. ("Novel"), and Lupin Pharmaceuticals, Inc. ("Lupin") all launched on or about March 30, 2015, when Par's 180-day exclusivity expired. On information and belief, none of these companies were sued or received a license from Novartis for the unexpired '197 and '728 Patents.

117.    Had Par launched its generic product as early as March 28, 2013, at least one of these generic companies would have obtained final FDA approval and launched its generic equivalent of Exforge immediately upon expiration of Par's 180-day exclusivity period. And with multiple generics on the market, the prices of generic Exforge would have eroded significantly and much earlier than they ultimately did.

118.    In sum, but for the unlawful Agreement, Plaintiff and other members of the Class would have paid lower prices for Exforge and its generic equivalents. Defendants have injured Plaintiff and other members of the Class by causing them to pay millions of dollars in overcharges on their purchases or reimbursements of Exforge and its generic equivalents.

## VI.    ANTICOMPETITIVE EFFECTS AND EFFECTS ON INTERSTATE AND INTRASTATE COMMERCE

119.    Defendants' anticompetitive scheme had the purpose and effect of unreasonably restraining and injuring competition by protecting Exforge from generic competition. But for the pay-for-delay agreement, Par would have entered the market earlier than September 2014. In addition, upon market entry by Par, Novartis would have begun selling its own less expensive Exforge AG in direct competition with the Par generic. Other ANDA-based Exforge generics—including those marketed by Mylan, Teva, Torrent, Novel, and Lupin—would have followed into the market as early as 180 days after Par's launch. The resulting competition would have forced decreases in the prices of Exforge, as price competition among the suppliers of branded and generic versions of Exforge would have been intense.

120.    But for Defendants' illegal conduct, Plaintiff and members of the Class would have paid less for branded and generic versions of Exforge. Defendants' conduct proximately caused Plaintiff's and the Class's injuries because it forced them to pay tens of millions of dollars in overcharges on purchases of branded and generic versions of Exforge.

121.    If generic competition for branded Exforge had not been unlawfully delayed, Plaintiff and members of the Class would have paid less for both branded and generic versions Exforge by: (a) substituting their purchases of branded Exforge with less-expensive generic versions of Exforge; and (b) purchasing generic Exforge at lower prices sooner.

122. As a result of the delay in generic competition brought about by Defendants' anticompetitive scheme, Plaintiff and members of the Class paid more for branded and generic Exforge than they would have paid absent Defendants' illegal conduct.

123. Defendants' efforts to restrain competition in the market for branded and generic versions of Exforge have substantially affected both interstate and intrastate commerce.

124. At all material times, Novartis manufactured, promoted, distributed, and sold substantial amounts of branded Exforge in a continuous and uninterrupted flow of commerce across state lines and throughout the United States. Defendants' anticompetitive conduct had substantial intrastate effects in every state of purchase in that, among other things, retailers within each state were foreclosed from offering cheaper generic versions of Exforge to purchasers within each state, which directly impacted and disrupted commerce for consumers and third-party payors within each state.

125. At all material times, Defendants transmitted funds and contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state lines in connection with the sale of branded and generic versions of Exforge.

126. General economic theory recognizes that any overcharge at a higher level of distribution generally results in higher prices at every level below. Professor Herbert Hovenkamp explains that "[e]very person at every stage in the chain will be poorer" as a result of the anticompetitive price at the top. [45] He also says that "[t]heoretically, one can calculate the

---

[45] *See* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice*, at 564 (1994).

percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."[46]

127.    The institutional structure of pricing and regulation in the pharmaceutical drug industry ensures that overcharges at the higher level of distribution are passed on to end-payors. Wholesalers and retailers passed on the inflated prices of branded and generic versions of Exforge to Plaintiff and members of the Class.

128.    Defendants' pay-for-delay agreement enabled Novartis to charge consumers and third-party payors prices in excess of what they otherwise would have been able to charge absent the Defendants' unlawful actions.

129.    These prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

## VII.    MONOPOLY POWER AND MARKET DEFINITION

130.    The relevant product market is Exforge (in all its forms and dosage strengths) and bioequivalent generic versions of Exforge. The relevant geographic market is the United States, including its territories, possessions, and the Commonwealth of Puerto Rico.

131.    At all relevant times, Novartis has maintained monopoly power over the market for Exforge and its AB-rated generic equivalents in that it has had the power to maintain the price of Exforge at supracompetitive levels without losing sales.

132.    Novartis has monopoly power over the price of fixed combination products comprising amlodipine and valsartan. Such direct evidence of Novartis's monopoly power includes, among other things, the abnormally-high price-cost margins enjoyed by Novartis prior

---

[46] *Id.*

to entry of generic Exforge and Novartis's ability to profitably maintain the price of Exforge well above competitive levels.

133.    Novartis's anticompetitive payment to Par demonstrates that Novartis enjoyed market and/or monopoly power with respect to Exforge (in all its forms and dosage strengths) and bioequivalent generic versions of Exforge.

134.    A small but significant non-transitory price increase above the competitive level for Exforge by Novartis would not cause a loss of sales sufficient to make the price increase unprofitable.

135.    At competitive price levels, Exforge does not exhibit significant positive cross-price elasticity of demand with any product other than AB-rated generic versions of Exforge.

136.    During the relevant period, Defendants' anticompetitive conduct has significantly damaged competition by reducing output and increasing prices for branded and generic Exforge, throughout the United States, including its territories, possessions, and the Commonwealth of Puerto Rico.

137.    Other drugs that are not AB-rated to Exforge cannot be substituted automatically for Exforge by pharmacists and do not exhibit substantial cross-price elasticity of demand with respect to Exforge. Thus, they are not economic substitutes for, nor reasonably interchangeable with, Exforge.

138.    The existence of other products designed to treat hypertension or other illnesses treated by Exforge has not significantly constrained Novartis's pricing of Exforge.

139.    Novartis needed to control only Exforge and its AB-rated generic equivalents, and no other products, in order to maintain the price of Exforge profitably at supracompetitive prices.

Only the market entry of a competing, AB-rated generic version of Exforge would render

Novartis unable to profitably maintain its prices of Exforge without losing substantial sales.

140.    Novartis, at all relevant times, enjoyed high barriers to entry with respect to

competition to the above-defined relevant product market due to patent and other regulatory

protections and high costs of entry and expansion.

141.    Novartis has maintained and exercised the power to exclude and restrict

competition to Exforge and AB-rated generics.

142.    At all relevant times, Novartis's market share in the relevant market was 100%,

implying substantial monopoly power.

## VIII.   CLASS ACTION ALLEGATIONS

143.    Plaintiff brings this action on behalf of itself and all others similarly situated as a

class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, seeking

damages on behalf of the following class (the "Class"):

> All persons and entities that indirectly purchased, paid, and/or
> provided reimbursement for some or all of the purchase price of
> Exforge or its AB-rated generic equivalents from Defendants,
> beginning at least as early as March 29, 2013 until the effects of
> Defendants' conduct cease ("Class Period"), in the District of
> Columbia, Puerto Rico, or any of the following states and
> commonwealths: Alabama, Alaska, Arizona, Arkansas, California,
> Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho,
> Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland,
> Massachusetts, Michigan, Minnesota, Mississippi, Missouri,
> Montana, Nebraska, Nevada, New Hampshire, New Jersey, New
> Mexico, New York, North Carolina, North Dakota, Oklahoma,
> Oregon, Pennsylvania, Rhode Island, South Carolina, South
> Dakota, Texas, Tennessee, Utah, Vermont, West Virginia,
> Wisconsin, or Wyoming.

144.    The following persons and entities are excluded from each of the above-described

proposed Class:

      (a)     Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

      (b)     All governmental entities, except for government-funded employee benefit plans;

      (c)     All persons or entities who purchased Exforge for purposes of resale or directly from Defendants or their affiliates;

      (d)     Fully-insured health plans (plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members);

      (e)     Flat co-payers (consumers who paid the same co-payment amount for brand and generic drugs);

      (f)     Pharmacy Benefit Managers;

      (g)     All Counsel of Record; and

      (h)     The Court, Court personnel and any member of their immediate families.

145.    Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiff believes that there are thousands of members of the Class widely dispersed throughout the United States. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together. The Class members are readily identifiable from information and records in Defendants' possession.

146.    Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Defendants in that they paid artificially inflated prices for branded and generic Exforge and were deprived of the benefits

of earlier and more robust competition from cheaper generic equivalents of Exforge as a result of Defendants' wrongful conduct.

147.    Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.

148.    Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation and with experience in class action antitrust litigation involving pharmaceutical products.

149.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the entire class, making overcharge damages with respect to the class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

150.    Questions of law and fact common to the Class include:

(a)    Whether Novartis unlawfully maintained monopoly power through the Defendants' Agreement;

(b)    Whether Defendants' scheme, in whole or in part, has substantially affected intrastate and interstate commerce;

(c)    Whether Defendants' conspired to delay generic competition for Exforge;

(d)    Whether, pursuant to the pay-for-delay agreement, Novartis's promise not to compete against Par's generic product constituted a payment;

(e)    Whether Defendants' Agreement was necessary to yield some cognizable, non-pretextual procompetitive benefit;

(f)    Whether Novartis's compensation to Par was large and unexplained;

(g)    Whether the pay-for-delay agreement was a bottleneck to further delay generic competition for Par;

(h)    Whether the pay-for-delay agreement harmed competition;

(i)    Whether Defendants' unlawful agreement, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiff and the members of the Class; and

(j)    The quantum of overcharges paid by the Class in the aggregate.

151.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

152.    Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## IX.    PLAINTIFF'S CLAIMS ARE TIMELY

153.    Defendants concealed from Plaintiff the material terms of the Agreement. For example, a January 2012 analyst presentation by Par lists a "Synthon/Exforge" "Business Development" arrangement in 2011. And Par's Form 10-K for the fiscal year ending December 31, 2011 stated:

> On November 30, 2011, we entered into an asset purchase
> agreement with Synthon Pharmaceuticals, Inc., and on December
> 30, 2011, we closed on our acquisition, of Synthon's ANDA for

> amlodipine besylate and valsartan (5 mg/320 mg and 10 mg/320
> mg) fixed dose combination tablets, a generic version of
> Exforge®, for $9,600 thousand. Under the terms of a separate
> license agreement with Novartis Pharmaceuticals Corporation, we
> have a certain launch date in October 2014.[47]

154.    Similarly, Novartis's Form 20-F for the fiscal year ending December 31, 2011

stated: "In the US, under a license agreement with a generics manufacturer, the product

[Exforge] is expected to face generic competition beginning in October 2014."[48]

155.    It was not until Novartis failed to launch an AG upon market entry by Par in

September of 2014 that it became clear that Novartis and Par's Agreement contained a no-AG

promise. No amount of diligence could have put Plaintiff on notice of its claim until September

30, 2014 at the earliest.

156.    Plaintiff had no knowledge of suspicious conduct prior to Novartis's failure to

launch an authorized generic upon Par's September 30, 2014 entry of generic Exforge.

157.    As a result of Defendants' concealment, all applicable statutes of limitations

affecting the Plaintiff's and the Class's claims have been tolled.

158.    Alternatively, if the statute of limitations is not tolled, this Complaint alleges a

continuing course of conduct (including conduct within the limitations period), and Plaintiff and

the members of the Class can recover for damages that they suffered during the limitations

period.

---

[47] Par Pharmaceutical Companies, Inc., Form 10-K, at F-22,
https://www.sec.gov/Archives/edgar/data/878088/000087808812000027/f201110k2281210amnolinks.htm.
[48] Novartis AG, Form 20-F at 7,
https://www.sec.gov/Archives/edgar/data/1114448/000104746912000354/a2205643z20-f.htm.

## X.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Conspiracy and Combination in Restraint of Trade under State Law**
**(Against All Defendants)**

159.    Plaintiff incorporates the preceding paragraphs by reference.

160.    Defendants entered into an unlawful pay-for-delay agreement that restrained competition in the market for Exforge and its AB-rated generic equivalents. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

(a)    delay entry of generic Exforge in order to lengthen the period in which Novartis's brand Exforge could monopolize the market and make supra-competitive profits;

(b)    keep an Exforge AG off the market during Par's 180-day generic exclusivity period, thereby allowing Par to monopolize the generic market for Exforge during that period and allowing Par to make supra-competitive profits;

(c)    allocate 100% of U.S. generic Exforge sales to Par during the first 180 days of generic sales; and

(d)    raise and maintain the prices that Plaintiff and the Class Members would pay for Exforge to and at supra-competitive levels.

161.    Defendants' unlawful agreement harmed Plaintiff and the Class Members as set forth above.

162.    There is no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect.

163.    Defendants' conduct violated the following state antitrust laws:

(a)    Ariz. Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona by the Class Members;

(b)     Cal. Bus. Code §§ 16700, et seq., and Cal. Bus. Code §§ 17200, et seq., with respect to purchases in California by the Class Members;

(c)     D.C. Code Ann. §§ 28-4501, et seq., with respect to purchases in the District of Columbia by the Class Members;

(d)     Hawaii Code § 480, et seq., with respect to purchases in Hawaii by the Class Members;

(e)     740 Ill. Comp. Stat. Ann. 10 / 3, *et seq.*, with respect to purchases in Illinois by the Class Members;

(f)     Iowa Code §§ 553 et seq., with respect to purchases in Iowa by the Class Members;

(g)     Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by Class Members;

(h)     Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine by the Class Members;

(i)     Mich. Comp. Laws Ann. §§ 445.772, et seq., with respect to purchases in Michigan by the Class Members;

(j)     Minn. Stat. §§ 325D.49, et seq., with respect to purchases in Minnesota by the Class Members;

(k)     Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Class Members;

(l)     Neb. Code Ann. §§ 59-801, et seq., with respect to purchases in Nebraska by the Class Members;

(m)    Nev. Rev. Stat. Ann. §§ 598A, et seq., with respect to purchases in Nevada by the Class Members, in that thousands of sales of branded and generic versions of Exforge took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct;

(n)    N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire by the Class Members;

(o)    N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico by the Class Members;

(p)    N.Y. Gen. Bus. L. §§ 340, et seq., with respect to purchases in New York by the Class Members;

(q)    N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina by the Class Members;

(r)    N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota by the Class Members;

(s)    Or. Rev. Stat. §§ 6.46.705, et seq., with respect to purchases in Oregon by the Class Members;

(t)    S.D. Codified Laws Ann. §§ 37-1, et seq., with respect to purchases in South Dakota by the Class Members;

(u)    Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee by the Class Members, with thousands of end-payors in Tennessee paying substantially higher prices for branded and generic versions of Exforge at Tennessee pharmacies;

(v)    Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by Damage Class Members who are either citizens or residents of Utah;

(w)     Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont by the Class Members;

(x)     W.Va. Code §§ 47-18-3, et seq., with respect to purchases in West Virginia by the Class Members; and

(y)     Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by the Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher prices for branded and generic versions of Exforge at Wisconsin pharmacies.

164.    Plaintiff and the Class Members have been injured in their business or property by Defendants' antitrust violations. Their injuries consist of (1) being denied the opportunity to purchase lower-priced generic versions of Exforge, and (2) paying higher prices for branded and generic versions of Exforge than they would have paid in the absence of Defendants' wrongful conduct. These injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

165.    Plaintiff and the Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

166.    Defendants are jointly and severally liable for all damages suffered by Plaintiff and the Class Members.

## SECOND CLAIM FOR RELIEF
### Monopolization and Monopolistic Scheme under State Law
### (Against Novartis)

167.    Plaintiff incorporates the preceding paragraphs by reference.

168.    Novartis has knowingly engaged in an anticompetitive scheme designed to delay and block entry of AB-rated generic equivalents of Exforge. The intended and accomplished goal of the scheme was to use exclusionary conduct to delay the ability of generic manufacturers to

launch competing, generic versions of Exforge. Novartis's exclusionary conduct maintained Novartis's monopoly over branded and generic Exforge.

169.    Plaintiff and the Class Members have suffered harm as a result of paying higher prices for Exforge and/or its AB-rated generic equivalents than they would have absent Novartis's anticompetitive conduct and continuing anticompetitive conduct.

170.    Novartis's conduct violated the following state antitrust laws:

(a)    Ariz. Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona by the Class Members;

(b)    Cal. Bus. Code §§ 16700, et seq., and Cal. Bus. Code §§ 17200, et seq., with respect to purchases in California by the Class Members;

(c)    D.C. Code Ann. §§ 28-4501, et seq., with respect to purchases in the District of Columbia by the Class Members;

(d)    Hawaii Code § 480, et seq., with respect to purchases in Hawaii by the Class Members;

(e)    740 Ill. Comp. Stat. Ann. 10 / 3, *et seq.*, with respect to purchases in Illinois by the Class Members;

(f)    Iowa Code §§ 553 et seq., with respect to purchases in Iowa by the Class Members;

(g)    Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by Class Members;

(h)    Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine by the Class Members;

(i)      Mich. Comp. Laws Ann. §§ 445.772, et seq., with respect to purchases in Michigan by the Class Members;

(j)      Minn. Stat. §§ 325D.49, et seq., with respect to purchases in Minnesota by the Class Members;

(k)      Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Class Members;

(l)      Neb. Code Ann. §§ 59-801, et seq., with respect to purchases in Nebraska by the Class Members;

(m)      Nev. Rev. Stat. Ann. §§ 598A, et seq., with respect to purchases in Nevada by the Class Members, in that thousands of sales of branded and generic versions of Exforge took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendant's conduct;

(n)      N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire by the Class Members;

(o)      N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico by the Class Members;

(p)      N.Y. Gen. Bus. L. §§ 340, et seq., with respect to purchases in New York by the Class Members;

(q)      N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina by the Class Members;

(r)      N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota by the Class Members;

(s)    Or. Rev. Stat. §§ 6.46.705, et seq., with respect to purchases in Oregon by the Class Members;

(t)    S.D. Codified Laws Ann. §§ 37-1, et seq., with respect to purchases in South Dakota by the Class Members;

(u)    Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee by the Class Members, with thousands of end-payors in Tennessee paying substantially higher prices for branded and generic versions of Exforge at Tennessee pharmacies;

(v)    Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by Damage Class Members who are either citizens or residents of Utah;

(w)    Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont by the Class Members;

(x)    W.Va. Code §§ 47-18-3, et seq., with respect to purchases in West Virginia by the Class Members; and

(y)    Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by the Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher prices for branded and generic versions of Exforge at Wisconsin pharmacies.

171.    Plaintiff and the Class Members have been injured in their business or property by Novartis's antitrust violation. Their injuries consist of (1) being denied the opportunity to purchase lower-priced generic versions of Exforge and (2) paying higher prices for these products than they would have paid in the absence of Novartis's wrongful conduct. These injuries are of the type the above antitrust laws were designed to prevent and flow from that which makes Novartis's conduct unlawful.

172.    Plaintiff and the Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Novartis's anticompetitive conduct

### THIRD CLAIM FOR RELIEF
### State Consumer Protection Violations
### (Against All Defendants)

173.    Plaintiff incorporates the preceding paragraphs by reference.

174.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiff and the Class Members were deprived of the opportunity to purchase generic versions of Exforge and were forced to pay higher prices for branded and generic versions of Exforge.

175.    For years, there was gross disparity between the price that Plaintiff and the Class Members paid for Exforge compared to what they would have paid for less expensive generic versions of Exforge, which should and would have been available but for Defendants' unlawful conduct.

176.    By engaging in the foregoing conduct, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the following state unfair and deceptive trade practices and consumer protection statutes:

### Florida Deceptive & Unfair Trade Practices Act ("FDUTPA")
### Florida Stat. §§ 501.201, et seq.

177.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. §§ 501.202(2).

178.    A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

179.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint.

180.    Defendants' conduct constitutes an unfair method of competition because Defendants restrained trade in the market for branded and generic versions of Exforge by unreasonably delaying the entry of cheaper, competing generic versions of Exforge from at least as early as March 2013 continuing through September 2014.

181.    This delay was the product of an unlawful pay-for-delay agreement, which resolved ongoing patent litigation between Novartis and Par. Under the agreements, Novartis agreed not to launch a competing Exforge AG during Par's 180-days of marketing exclusivity.

182.    Defendants' conduct preserved Novartis's monopoly over Exforge for an additional five years and stunted the effectiveness of future generic competition. This in turn caused end-payor purchasers of branded and generic versions of Exforge in Florida to continue to pay supracompetitive prices for those products. Further, Defendants sold branded and generic versions of Exforge in Florida and their conduct had a direct and substantial impact on trade and commerce in Florida.

183.    Accordingly, such conduct falls within the prohibitions in Florida Stat. §§ 501.202(2).

### Massachusetts Consumer Protection Act ("MCPA") Mass. Gen. L. Ch. 93A, et seq.

184.    The MCPA regulates trade and commerce "directly or indirectly affecting the people of this commonwealth." Mass. Gen. L. Ch. 93A § 9(1).

185.    Under the MCPA, "[a]ny person, who has been injured by another person's use or employment of any method, act or practice" that constitutes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. L. Ch. 93A §§ 2, 9(1). MCPA § 2(b) provides that these terms are interpreted consistent with Section 5 of the FTC Act (15 U.S.C. § 45(a)), which also prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." Mass. Gen. L. Ch. 93A § 2(b); 15 U.S. § 45(a)(1).

186.    Defendants' conduct constitutes an unfair method of competition because Defendants restrained trade in the market for branded and generic versions of Exforge by unreasonably delaying the entry of cheaper, competing generic versions of Exforge from at least as early as March 2013 continuing through September 2014.

187.    This delay was the product of an unlawful pay-for-delay agreement, which resolved ongoing patent litigation between Novartis and Par. Under the agreements, Novartis agreed not to launch a competing Exforge AG during Par's 180-days of marketing exclusivity.

188.    Defendants' conduct preserved Novartis's monopoly over Exforge for an additional five years and stunted the effectiveness of future generic competition. This in turn caused end-payor purchasers of branded and generic versions of Exforge in Massachusetts to continue to pay supracompetitive prices for those products. Further, Defendants sold branded and generic versions of Exforge in Massachusetts, and their conduct had a direct and substantial impact on trade and commerce in Massachusetts. Accordingly, such conduct falls within the prohibitions in Ch. 93A § 2.

**Missouri Merchandising Practices Act ("MMPA")**
**Mo. Rev. Stat. 407.020**

189.    Under Section 407.020, the MMPA prohibits "[t]he act, use or employment by

any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair

practice or the concealment, suppression, or omission of any material fact in connection with the

sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. 407.020.

190.    The Missouri Attorney General has defined an "unfair practice" as:

> any practice which . . . [o]ffends any public policy as it has been
> established by the Constitution, statutes or common law of this
> state, or by the Federal Trade Commission, or its interpretive
> decisions; or . . . [i]s unethical, oppressive, or unscrupulous; and
> . . . [p]resents a risk of, or causes, substantial injury to consumers.

Mo. Att'y Gen. Reg., 15 CSR 60-8.02.

191.    Defendants' conduct constitutes an unfair method of competition because

Defendants restrained trade in the market for branded and generic versions of Exforge by

unreasonably delaying the entry of cheaper, competing generic versions of Exforge from at least

as early as March 2013 continuing through September 2014.

192.    This delay was the product of an unlawful pay-for-delay agreement that resolved

ongoing patent litigation between Novartis and Par. Under the agreements, Novartis agreed not

to launch a competing authorized generic version of Exforge during Par's 180-days of marketing

exclusivity.

193.    Defendants' conduct preserved Novartis's monopoly over Exforge for an

additional five years and stunted the effectiveness of future generic competition. This in turn

caused end-payor purchasers of branded and generic versions of Exforge in Missouri to continue

to pay supracompetitive prices for those products. Further, Defendants sold branded and generic

versions of Exforge in Missouri, and Defendants' conduct had a direct and substantial impact on

trade and commerce in Missouri. Upon information and belief, Defendants also directed

advertising and marketing efforts for branded and generic versions of Exforge in Missouri.

Accordingly, Defendants' conduct falls within the prohibitions in the MMPA.

### FOURTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Against All Defendants)**

194.    Plaintiff incorporates by reference the preceding allegations.

195.    To the extent required, this claim is pleaded in the alternative to the other claims

in this Complaint.

196.    This claim is pled by Plaintiff and the Class against all Defendants.

197.    Defendants have financially benefited from overcharges on sales of branded and

generic versions of Exforge, which resulted from the unlawful and inequitable acts alleged in this

Complaint. These overcharges were borne by Plaintiff and the Class Members who purchased

and/or reimbursed all or part of the purchase price of branded and generic Exforge. The benefits

conferred upon Defendants are substantial and measurable, in that the revenues Defendants have

earned due to unlawful overcharges are ascertainable by review of both sales records and the

unlawful pay-for-delay agreement itself.

198.    Moreover, Novartis's promise not to launch a competing authorized generic

version of Exforge during Par's 180-day marketing exclusivity period was inextricably linked to

the overcharges that Plaintiff and the Class Members were to pay and thus part of the enrichment

of Defendants at the expense of Plaintiff and the Class Members.

199.    For years, there was gross disparity between the price that Plaintiff and the Class

Members paid for Exforge compared to what they would have paid for less expensive generic

versions of Exforge, which should and would have been available but for Defendants' unlawful

and inequitable conduct.

200.    Defendants repeatedly and continuously received financial benefits at the expense of Plaintiff and the Class Members through each sale of branded and generic versions of Exforge at an inflated price.

201.    It would be futile for Plaintiff and the Class Members to seek a remedy from any party with whom they had or have privity of contract. Defendants have paid no consideration to any other person for any of the benefits they received indirectly from Plaintiff and the Class Members.

202.    It would be futile for Plaintiff and the Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Exforge, as those intermediaries cannot reasonably be expected to compensate Plaintiff and the Class Members for Defendants' unlawful conduct.

203.    The financial benefits that Defendants derived rightfully belong to Plaintiff and the Class Members, which paid anticompetitive prices that inured to Defendants' benefit.

204.    It would be inequitable under the unjust enrichment principles of the states listed below for Defendants to retain any of the overcharges that Plaintiff and the Class Members paid for branded and generic versions of Exforge which were derived from Defendants' anticompetitive, unfair, and unconscionable methods, acts, and trade practices.

205.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds received by them into a common fund for the benefit of Plaintiff and the Class Members.

206.    A constructive trust should be imposed upon all unlawful or inequitable sums Defendants received, which arise from overpayments for branded and generic versions of Exforge by Plaintiff and the Class Members.

207.    Plaintiff and the Class Members have no adequate remedy at law.

208.     By engaging in the foregoing unlawful or inequitable conduct, which deprived Plaintiff and the Class Members of the opportunity to purchase lower-priced generic versions of Exforge and forced them to pay higher prices for branded and generic versions of Exforge, Defendants have been unjustly enriched in violation of the common law of various states and commonwealths, as outlined below:

**Alabama**

209.     Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Alabama at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Class as a direct result of the unlawful overcharges and have retained this money. Defendants have benefitted at the expense of the Class from revenue resulting from unlawful overcharges for Exforge or its AB-rated generic equivalents. It is inequitable for Defendants to accept and retain the benefits received without compensating the Class.

**Alaska**

210.     Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Alaska at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefits bestowed upon them by the Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Arizona**

211.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Exforge or its AB-rated generic equivalents. The Class has been impoverished by the overcharges for Exforge or its AB-rated generic equivalents resulting from Defendants' unlawful conduct. Defendants' enrichment and the Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment and the Class's impoverishment, because the Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no remedy at law.

**Arkansas**

212.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Arkansas at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**California**

213.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in California at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit

from the Class as a direct result of the unlawful overcharges. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of the Class.

**Colorado**

214.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Colorado at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants have benefitted at the expense of the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Connecticut**

215.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Connecticut at prices that were more than they would have been but for Defendants' actions. Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of the Class.

**Delaware**

216.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Delaware at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Exforge or its AB-rated generic equivalents. The Class has been impoverished by the overcharges for Exforge or its AB-rated generic

equivalents resulting from Defendants' unlawful conduct. Defendants' enrichment and the Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no remedy at law.

**District of Columbia**

217.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in the District of Columbia at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

218.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Florida at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefits bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Georgia**

219.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Georgia at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Hawaii**

220.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Hawaii at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Idaho**

221.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Idaho at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit conferred upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Illinois**

222.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Illinois at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Class. It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

223.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Iowa at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Exforge or its AB-rated generic equivalents, which revenue resulted from anticompetitive prices paid by d the Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of the Class. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Class.

**Kansas**

224.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Kansas at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants retained the benefits bestowed upon them

under unjust circumstances arising from unlawful overcharges to the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Kentucky**

225.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Kentucky at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit conferred upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Louisiana**

226.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Louisiana at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Exforge or its AB-rated generic equivalents. The Class has been impoverished by the overcharges for Exforge or its AB-rated generic equivalents resulting from Defendants' unlawful conduct. Defendants' enrichment and the Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no other remedy at law.

**Maine**

227.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Maine at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Maryland**

228.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Maryland at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Massachusetts**

229.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Massachusetts at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit conferred upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Michigan**

230.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Michigan at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Minnesota**

231.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Minnesota at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated and knowingly accepted the benefits bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Mississippi**

232.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Mississippi at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Class as a direct result of the unlawful overcharges. Defendants retain the benefit of overcharges received on the sales of Exforge or its AB-rated generic equivalents, which in equity and good conscience belong to the Class on account of Defendants' anticompetitive conduct.

Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Missouri**

233.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Missouri at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class. Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Class.

**Montana**

234.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Montana at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Nebraska**

235.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Nebraska at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. In justice and

fairness, Defendants should disgorge such money and remit the overcharged payments back to the Class.

**Nevada**

236.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Nevada at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Exforge or its AB-rated generic equivalents. Defendants appreciated the benefits bestowed upon them by the Class, for which they have paid no consideration to any other person. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**New Hampshire**

237.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in New Hampshire at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

238.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in New Jersey at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. The benefits

conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the Class. Defendants have paid no consideration to any other person for any of the unlawful benefits they received from the Class with respect to Defendants' sales of Exforge or its AB-rated generic equivalents. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Class.

**New Mexico**

239.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in New Mexico at prices that were more than they would have been but for Defendants' actions. Defendants have knowingly benefitted at the expense of the Class from revenue resulting from unlawful overcharges for Exforge or its AB-rated generic equivalents. To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

240.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in New York at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Exforge or its AB-rated generic equivalents, which revenue resulted from anticompetitive prices paid by the Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of the Class. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

241.     Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in North Carolina at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. The Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the Class. The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records. Defendants consciously accepted the benefits conferred upon them.

**North Dakota**

242.     Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Exforge or its AB-rated generic equivalents. The Class has been impoverished by the overcharges for Exforge or its AB-rated generic equivalents resulting from Defendants' unlawful conduct. Defendants' enrichment and the Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no remedy at law. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Class.

**Oklahoma**

243.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Oklahoma at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. The Class has no remedy at law. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Oregon**

244.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Oregon at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of the benefit bestowed upon them by the Class. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Class.

**Pennsylvania**

245.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Pennsylvania at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Puerto Rico**

246.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Puerto Rico at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Exforge or its AB-rated generic equivalents. The Class has been impoverished by the overcharges for Exforge or its AB-rated generic equivalents resulting from Defendants' unlawful conduct. Defendants' enrichment and the Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment and the Class's impoverishment, because the Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no remedy at law.

**Rhode Island**

247.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Rhode Island at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**South Carolina**

248.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in South Carolina at prices that were more than they would have been but for Defendants' actions. The benefits conferred upon

Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the Class. Defendants realized value from the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**South Dakota**

249.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in South Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing the Class.

**Tennessee**

250.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Tennessee at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class. It would be futile for the Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from the Class with respect to Defendants' sales of Exforge or its AB-rated generic equivalents. It would be futile for The Class to exhaust all remedies against the entities with which the Class has privity of contract

because the Class did not purchase Exforge or its AB-rated generic equivalents directly from any Defendant.

**Texas**

251.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Texas at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of or appreciated the benefit bestowed upon them by the Class. The circumstances under which Defendants have retained the benefits bestowed upon them by the Class are inequitable in that they result from Defendants' unlawful overcharges for Exforge or its AB-rated generic equivalents. The Class has no remedy at law.

**Utah**

252.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Utah at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Vermont**

253.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Vermont at prices that were more than they would have been but for Defendants' actions. The Class has conferred an

economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants accepted the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Virginia**

254.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Virginia at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of the benefit bestowed upon them. Defendants should reasonably have expected to repay the Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Exforge or its AB-rated generic equivalents. Defendants have paid no consideration to any other person for any of the benefits they have received from the Class.

**Washington**

255.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Washington at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit conferred upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**West Virginia**

256.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in West Virginia at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Wisconsin**

257.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Wisconsin at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Wyoming**

258.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for Exforge or its AB-rated generic equivalents in Wyoming at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants accepted, used and enjoyed the benefits bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

## XI.    DEMAND FOR JUDGMENT

259.    WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully demands that this Court:

(a)    Determine that this action may be maintained as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as the representative of the Class;

(b)    Enter joint and several judgments against the Defendants and in favor of Plaintiff and the Class;

(c)    Grant Plaintiff and the Class equitable relief in the nature of a restitution and the creation of a constructive trust to remedy Defendants' unjust enrichment;

(d)    Award the Class damages, and, where applicable, treble, multiple, punitive, and other damages, in an amount to be determined at trial;

(e)    Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

(f)    Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XII.    JURY DEMAND

260.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

Date: June 19, 2018

**LABATON SUCHAROW LLP**

By: */s/ Gregory S. Asciolla*

Gregory S. Asciolla
Jay L. Himes
Karin E. Garvey
Robin A. van der Meulen
Domenico Minerva
Matthew J. Perez
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
gasciolla@labaton.com
jhimes@labaton.com
kgarvey@labaton.com
rvandermeulen@labaton.com
dminerva@labaton.com
mperez@labaton.com


Roberta D. Liebenberg
Paul Costa
Adam J. Pessin
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Tel: (215) 567-6565
Fax: (215) 568-5872
rliebenberg@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com

*Counsel for UFCW Local 1500 Welfare
Fund and the Proposed Class*